## Creps *versus* Dunham.

1. H. bought "timber leave," for making staves, which were not to be removed till the "leave" was paid for. H. made staves and sold his right to D. All that passed to D. was the right to take the staves on paying for the "leave," and no actual delivery to D. was necessary to make the transfer good against H.'s creditors.

2. The staves were levied on for H.'s debt, the "leave" not having been paid; D. had not the possession nor the right of possession, so as to maintain trespass against the sheriff.

3. Arbitrators were chosen in the action; without striking off the rule, the plaintiff ruled the defendant to plead, which he did and the case went to trial. Pleading admitted the case to be in court and going to trial waived any error in the proceedings.

October 26th 1871. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Indiana county:* No. 76, of October and November Term 1871.

This was an action of trespass d. b. a., brought April 16th 1868, by Azariah Dunham against Jacob Creps, late sheriff of Indiana county, for levying on and selling a large number of staves under an execution against Thomas P. Hatch; the plaintiff alleging that the staves were his property.

After filing the declaration, the plaintiff entered a rule of reference on the 7th of February 1869, and on the 3d of March the attorneys of the parties chose arbitrators. The record shows the service of the rule of reference on the 4th of March, but nothing further until October 17th 1870, when a rule to plead in ten days was entered. On the 28th of October the defendant pleaded "not guilty." The cause was tried April 12th 1871, before Campbell, P. J., of the 18th district.

To December Term 1867, two executions were issued against Hatch, and the sheriff levied on several distinct lots of staves on the farms of James Lowman, John Saddler, Joseph McCartney, James D. Dias and ⸺ Wachob, as Hatch's property.

It appeared that the owners of these farms contracted with Hatch for "timber-leave" on their land, at different prices. Hatch to have the right to enter upon the land, cut, pile and "cob" staves, but not remove them until the wood-leave should be paid for; there was no precise amount of timber or number of staves contracted for, nor any specified time for which Hatch might continue to cut. In some of the contracts it was expressly understood that he was to stop when the landowners directed. The contracts were all by parol. Hatch cut a large amount of staves under that contract; some were partly paid for, some wholly unpaid. On the 18th of October 1866, he entered into an agreement in writing with Dunham, the plaintiff, by which, for the consideration of $3550,

[Creps v. Dunham.]

Hatch agreed " to sell and release the shop, house and lot in Franklin; also the use of the shop used heretofore (by Hatch) at Altimus, to be and remain as the property of Dunham, free from all encumbrance." Also " to deliver at the shops before mentioned, 125,000 shook staves, as good as those now at shops, at as early a period as possible, not to exceed one year." Also " two joints of the shook shed at Nineveh station, P. R. R." Hatch " to use his influence in behalf of (Dunham) in procuring staves, timber, &c., for supply of said shops, hereby releasing and giving over to the said Dunham all his right, &c., of, in and to all or any timber or timber-leave which the said Hatch may have or hold." Hatch also transferred to Dunham " the stave machinery and all tools now in use (in the shops), for the manufacture of stock." Hatch to give possession of the property at the date of the agreement, and a deed when all the money should be paid; but reserving the privilege to make in the shops about 1400 shooks " to fill contracts already made by him." Dunham paid the money under the contract. This contract was made and signed on behalf of Dunham by J. W. Kellar, his agent.

At the sheriff's sale Cunningham, who appeared to be acting for or with the execution-creditors, bought the staves. He paid the amount remaining unpaid to the landholders.

There was evidence that Kellar, the agent of Dunham, had agreed to pay some of the landholders for the staves. Some of the staves cut by Hatch were moved and were not levied on.

Tomb, an agent of Dunham, after Kellar who had died, testified : * * *

" Some three weeks or a month before sheriff levied on them, wanted to know how many staves Mr. Dunham had, as I did not know much about how many he had; found staves at James A. Lowman's ; I found short and long staves, about 30,000, more or less, did not count them; at Wachob 28,000, did not count them; at John Saddler's between 2000 and 3000; on land of Joseph McCartney between 30,000 and· 40,000; on land of James D. Dias about 8000, did not count them; there were some staves brought out from Lowman's land, after I took charge of them as agent; some of Wachob's staves were brought in. Sheriff Creps levied on the staves. * * *  I agreed to pay McCartney $6 per thousand stumpage, so far as the staves had been delivered to Kellar in his lifetime; I paid the stumpage on the McCartney lot; made arrangements with Saddler to deliver the staves, but he did not get it done until it was levied upon by the sheriff; some of them were hauled a part of the way; some of the McCartney staves were hauled out of the woods to the road; * * * Wachob staves—made arrangements with him to have them delivered right away; he was to haul them himself; they were hauled out in a long pile along the road ; they were all long staves; don't

[Creps *v.* Dunham.]

know when they were hauled out; Dias staves were standing in the woods where they were made; think they had not been moved at all; * * * did not pay McCartney any wood-leave for staves levied on by the sheriff; the McCartney and Saddler staves in the woods were piled up by the trees where made; the Lowman staves were brought out before my entering on the business; nine thousand of the Dias staves were hauled out; they were sold by the sheriff; * * * found them there when I went around to see; don't know who caused them to be hauled out; * * * did not pay for the making of any staves levied on; did not pay for the making of any staves after I took charge of them; don't know when any of the staves were made that were levied on; don't know who paid the timber-leave on staves levied on; did not move any staves when I went around; did not mark them in any way; I endorsed what Mr. Kellar had done about hauling the staves."

The following were the points of the plaintiff with their answers:—

"3. If the jury believe that any of the staves sold by the sheriff were made before the sale of October 18th 1866, by Hatch to Dunham, and remained on the premises where made, they were in the possession of the respective landowners, subject to the payment of timber-leave, and not in Hatch's possession, and that therefore such possession thereof was taken by Dunham, after his purchase, as the law under the circumstances could require."

"We answer, if the landowners were to hold the possession as against Hatch till paid, they might deliver the staves made to Dunham or his agent, and such possession would enable him to hold the staves; but there must be a possession taken such as the property was susceptible of. The merely looking at them would not be such possession. Was such possession taken by Dunham? The facts are for you."

"5. If the jury believe that the staves seized and sold by the sheriff were under such circumstances sold by the landowners to Dunham's agents, who agreed to pay the landowners for them, and took possession of them by counting, such contract vested in the plaintiff the right of property in such staves so purchased, and the plaintiff should recover."

"The plaintiff's 5th point is affirmed."

The defendant's 2d point and its answer were:—

"Even if there was a sale to Dunham of the property levied upon by the sheriff, it was fraudulent and void in law, there being no such change in the possession as the property would admit of, and as the law requires against creditors of the vendor."

"We answer, that whether there was a delivery of the possession of these staves or any part of them to the plaintiff, is for the jury. If they were as we have indicated, we do not think such sale would be void in law."

[Creps v. Dunham.]

The court charged:—* * *

" It appears that the agreement was that Hatch might go upon their land and take out staves and pile or cob them up, but not remove them until paying so much per thousand to the owner for the timber out of which they were made, and until that was done Hatch could not take them away, and they remained in possession of the land or timber-owners.    We think this does not amount to a contract for real estate at all.    Hatch might cut and make into staves just as long as the owners saw proper, and then the owner would sell the timber out of which they were made to Hatch on paying for it, and could not move the staves without payment of the timber out of which they were made; then was there any possession of these staves in Hatch at any time ?    His right to remove them was contingent, if we have stated the contracts correctly, and not having removed them the possession remained in the landowner, and Hatch might transfer to another by parol his interest, and authorize another to take the staves on the same terms, he could take like himself.    [Then, did Hatch transfer to Dunham or his agent the right to haul away these staves, or any of them ?    Hatch says he told Dunham's agent he might haul some staves and he would allow him for it, and did he in pursuance of such transfer take possession ?    If he did he would have a right, we think, to hold it against the sheriff's vendee.] * * * It is clear Hatch had no right to any timber he had not worked up into staves, only at the will of the owners of the land he had nothing to transfer, and it was only a matter of grace that the owners allowed any staves to be made by either Hatch or Dunham.    If the contract of Hatch was only to cut at the pleasure of the owner or owners a particular space and on the terms we have stated, this was no license for any particular time, and only a sale of the timber in the staves before removal."

The verdict was for the plaintiff for $1410.19.

The defendant took out a writ of error.    He assigned for error,

The answers to the plaintiff's 3d and 5th points; the answer to the defendant's 2d point; the part of the charge in brackets; and, " 5, the court had no jurisdiction; the case being out of court on a rule to arbitrate, taken at the instance of plaintiff, under which arbitrators were chosen, and before whom the case was pending at the time of the trial in court."

J. P. Blair and A. W. Taylor, for plaintiff in error.

H. W. Weir and Stewart & Clark, for defendant in error.

The opinion of the court was delivered, November 6th 1871, by SHARSWOOD, J.—This case has some appearance of complication and difficulty, as presented by the record and paper-books, but if we exclude from it all extraneous and immaterial facts, that com-

plication and difficulty will vanish. It may be thus stated : Hatch had made a contract with a number of landowners for what is termed "timber-leave;" that is, that he should have the right to cut timber on their land and manufacture it into staves, he paying a certain sum per thousand for the timber of the staves so manufactured; but the staves were not to be removed from the land until they were paid for. He had accordingly cut and manufactured a considerable number, which were remaining on the land, unpaid for, in whole or in part. Hatch then contracted with Dunham in writing to deliver to him one hundred and twenty-five thousand shock staves at as early a period as possible, and not to exceed one year from the date of the agreement, which was October 18th 1866. This certainly was not an executed sale of any particular staves, but an executory agreement only, which might have been performed on his part by the delivery of any such staves, whether those now in question or others. But the agreement proceeded further to release and give over to Dunham all his (Hatch's) interest of, in or to all or any timber or timber-leave which the said Hatch may have or hold. It would rather seem that this did not comprehend timber already manufactured into staves, but was intended as an assignment of his interest in his contracts with the landholders for the privilege of cutting timber to be manufactured into staves, and of such as was cut but not yet manufactured. It is true, that Hatch might by parol have transferred his interest in the staves already manufactured to Dunham. There is some evidence, though slight, of such an agreement in the testimony of William Caldwell. "Mr. Hatch said he could not get the staves hauled, and for Mr. Kellar (Dunham's agent) to go on and get them." It is highly probable that there was such an arrangement in order to fulfil, in part at least, his contract for the delivery of one hundred and twenty-five thousand staves, for which he had been paid in full. But what passed by that transfer to Dunham ? Not the possession or right of possession, for Hatch had it not himself to transfer. The possession and the right of possession were in the landowners until they were paid for the timber-leave. All that passed to Dunham was the right upon payment of the timber-leave to take the possession. No actual delivery of possession by Hatch to Dunham was necessary to make the transfer good as against Hatch's creditors, under the cases of Linton *v.* Butz, 7 Barr 89, and Pier *v.* Duff, 13 P. F. Smith 59. Where the vendor himself has not the possession of the chattel, or the right of possession, it is clear that he cannot be required to deliver it. At the time of the levy by the sheriff on these staves, as the property of Hatch, Dunham had not the possession or the right of possession, and could not maintain an action of trespass for taking them : Fitler *v.* Shotwell, 7 W. & S. 14 ; Ward *v.* Taylor, 1 Barr 238 ;

[Creps v. Dunham.]

Lewis v. Carsaw, 3 Harris 31; Weitzel v. Marr, 10 Wright 463. Indeed, the contention that Dunham had any right to maintain this action, founded on the transfer of Hatch, was not pressed in the argument before us; but the able and ingenious counsel for the defendants in error relied principally upon the ground that there was evidence of a subsequent transfer by the landowners to him. They might, indeed, assign their right of possession with their right to receive the unpaid timber-leave from Hatch without payment, if they chose. This would have given him the right of possession, and if he had a previous transfer of Hatch's interest, the full property. But after looking carefully through the record, I can find no evidence of any such transfer by them by which they waived their right of possession until paid. Even as to Mc-Cartney, it was only as to ten or eleven thousand staves which were removed before the levy, and not comprehended in it. As to the residue, the witness stated distinctly that the purchase at sheriff's sale paid for the timber-leave. So as to the other landowners; they all testified that the balance due them had been either paid or settled by the sheriff's vendee. Indeed it would rather seem to have been considered that what was sold by the sheriff was merely the right, title and interest of Hatch, and had his return conformed thereto, Dunham could have had no shadow of title in any aspect of the case, to have maintained an action of trespass against him. As it was, the right to that action was in the landowners, if in point of fact the goods were taken out of their possession and delivered to the sheriff's vendee without paying their claims.

The learned judge below, as well in his answers to the points presented to him, as in his charge, recognised these principles. But the error which runs through the whole was in submitting to the jury the question whether there had been a delivery of possession of the staves either by Hatch or the landowners to Dunham. Of this there was no evidence, that we can discover. The jury were instructed in the answer to the 3d point of the plaintiff, "that merely looking at them would not be such possession," which was certainly true; but in affirming the plaintiff's 5th point they were in effect told that the plaintiff might take possession "by counting." Tomb certainly does testify that as the agent of Dunham he went on the land and counted the staves. But that was no evidence of possession—the actual possession and the right of possession being at that very time in the owners of the land upon which they were "cobbed" or piled.

We think there is nothing in the 5th assignment of error. It is true, that the record shows that a rule to arbitrate was entered by the plaintiff and arbitrators chosen. After this, however, the defendant was ruled to plead, and pleaded "not guilty," thereby admitting the case to be in court. But clearly, after going to

[Creps *v.* Dunham.]

trial without raising that objection, the plaintiff in error waived it, and cannot be heard here to complain.

Judgment reversed, and *venire facias de novo* awarded.